The Honorable Neely Cassady State Senator P.O. Box 1810 Nashville, AR 71852
Dear Senator Cassady:
This is in response to your request for an opinion on several questions concerning interpretation of language contained in the Open Cut Land Reclamation Act of 1977, Act 336, and what effect that language might have on ownership of mineral rights. Your questions are restated and answered below in the order posed.
 1. Section 7(e) of the Open Cut Land Reclamation Act of 1977, codified at Ark. Code Ann. 15-57-315(5), requires that mine operators engaged in open cut mining under permit may not "remove the lateral support in the vicinity of any property line . . . closer than a distance equal to ten feet (10') plus one and one-half (1-1/2) times the depth of the excavation measured from the property line or right-of-way." Do the words "property line" refer to the "property line" of the permitted area, or the fee simple "property line" of an adjacent fee simple owner?
Section 15-57-315(5) is directed toward open cut mining operations where overburdened is removed and not replaced after mining operation cease. Thus, if an operator intends to and does replace the fill removed during mining operations, thereby restoring the lateral support, it would appear that the restriction would not apply. However, the language seems to be clear as to the meaning of the words "any property line." There is nothing in the Act which defines that phrase. Nor is there any indication that it should be interpreted other than by its plain meaning.
In City of North Little Rock v. Montgomery,261 Ark. 16, 18, 546 S.W.2d 154 (1977), the Arkansas Supreme Court said:
 `We have held that [T]he meaning of a statute must be determined from the natural and obvious import of the language used by the legislature without resorting to subtle and forced construction for the purpose of limiting or extending the meaning. * * * It is our duty to construe a legislative enactment just as it reads.' Black v. Cockrill, Judge, 239 Ark. 367, 389 S.W.2d 881 (1965). We have also said `[I]n construing statutes in the absence of any indication of a different legislative intent, we give words their ordinary and usually accepted meaning in common language.' Phillips Petroleum v. Health, 254 Ark. 847, 497 S.W.2d 30 (1973).
It is my opinion that the words do indicate the property line of the fee simple owner, not the property line of the permitted area.
 2. In interpreting the same statutory section and language ("any property line") where the ownership of a mineral estate has been severed by recorded deed from the surface estate with the mineral estate owner (rather than the surface owner) holding a permit for mining authorized by the Act and ownership of a portion of the surface estate is transferred to a third party thus creating a new "property line" for the surface estate that is not contiguous with that of the mineral estate owner, is the mineral estate owner prohibited, as a matter of law, from mining beyond the required set back distance of the new surface boundary?
This question concerns a situation where the title to the surface rights and the mineral rights is severed. The issue becomes whether a change in a property line of a surface estate would cause a corresponding change in the setback requirements provided in the Act. The answer could have a substantial impact on the rights of the owner of the subsurface interest. E.g., if A owns the mineral and surface rights to Blackacre and then severs the two and conveys away one-half of Blackacre, would he then be restricted in his access to the minerals in that half? The answer would depend upon the nature of the mining operation and how intrusive it is. If the property can be mined without disturbing the surface of the adjacent parcel, the fact that the property lines are no longer parallel would probably not have any practical impact. However, if the operation did require a physical presence on the adjacent property such as would be the case in open cut mining, the fact that one no longer owned the surface rights above his mining rights could have a substantial impact indeed.
The state of the law in Arkansas is generally that a landowner has an absolute right to subjacent and lateral support of his property. Western Coal 
Mining Co. v. Young, 188 Ark. 191 (1933); Paris Purity Coal Co. v. Pendergrass, 193 Ark. 1031 (1937); Benton v. U.S. Manganese Corp., 229 Ark. 181 (1958). To illustrate, A, who owns property adjacent to B, cannot do anything to his property that would cause B's property to subside. There is no law that speaks directly to the specific question of how a boundary change of a surface estate could affect the rights of the owner of the subsurface estate. There are several issues which much be considered. The Open Cut Land Reclamation Act, now codified at A.C.A.15-57-301 et seq., acknowledges that subsidence is a likely result of open cut mining. The Act attempted to provide a rule that would prevent or at least lessen the possibility of such damages by mandating a setback requirement.
It would appear that if the boundary changes, the setback requirements would also change. The owner of the mineral rights could possibly continue to mine and use open cut methods, but he would probably have to get an agreement with the new owner of the adjacent parcel to come upon his land to mine and would also probably have to pay for any damage that occurred to the surface.
 3. Under the same set of assumptions in question (2) must the permit holder comply with the lateral support requirements when the surface owner property lines change?
Due to the foregoing, it is my opinion that the owner of the mineral rights, if he does not also own the surface rights, and if the Act applies, could be restricted in his access to the minerals. However, he might be entitled to some compensation if that restriction results in a taking of his property.
 4. Under the Open Cut Reclamation Act of 1977, Act 336 of 1977 codified at Ark. Code Ann. 15-57-30 through 115-57-321 what is the duty of the Arkansas Department of Pollution Control and Ecology in interpreting clearly ambiguous statutory language?
The provision of the Act codified at A.C.A. 15-57-305
provides that the chief administrative officer is the Director of the Department of Pollution Control and Ecology. Arkansas case law has long held that the agency's interpretation of a statute it is charged to administer be given great deference. Baily v. Southland Gasoline Company, 131 F.2d 412, cert granted 63 S.Ct. 526, 317 U.S. 623, 87 L.Ed. 505, Rev. 63 S.Ct. 917, 317 U.S. 44, 87 L.Ed. 1244 (1943); Arkansas Department of Human Services v. Greene Acres Nursing Home, Inc., 296 Ark. 475 (1988); Arkansas Public Service Commission v. Allied Telephone Company, 274 Ark. 478 (1981); and Arkansas Contractors Licensing Board v. Butler Construction Co., Inc. of Barling, Ark., 295 Ark. 223 (1988). Of course, those interpretations can be appealed.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Jennifer A. Love.
Sincerely,
STEVE CLARK Attorney General
SC:dd